# EXHIBIT 4

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY, COMMERCIAL DIVISION**

| | |
|---|---|
| 218 Broadway, LLC and Pentalon Construction, Inc.,<br><br>*Plaintiffs*,<br><br>v.<br><br>J.P. Morgan Chase Bank, N.A.; Wells Fargo Bank, N.A.; and John Doe Chase Employees #1-#10,<br><br>*Defendants*. | Index No. ________________<br><br>**SUMMONS** |

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this Action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on Plaintiffs' Attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
August 7, 2025

*/s/ Christie R. McGuinness*

Christie R. McGuinness, Esq.
christie.mcguinness@saul.com
SAUL EWING LLP
1270 Avenue of the Americas, Suite 2800
New York, NY 10020
Telephone: (212) 980-7200
Facsimile: (212) 980-7209

*Counsel for Plaintiffs*
*218 Broadway, LLC and Pentalon Construction, Inc.*

TO:

J.P. MORGAN CHASE BANK, N.A.
383 Madison Avenue
New York, New York
10017

WELLS FARGO BANK, N.A.
101 North Phillips Avenue
Sioux Falls, South Dakota
57117

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY, COMMERCIAL DIVISION**

| | |
|---|---|
| 218 Broadway, LLC and Pentalon Construction, Inc.,<br><br>*Plaintiffs*,<br><br>v.<br><br>J.P. Morgan Chase Bank, N.A.; Wells Fargo Bank, N.A.; and John Doe Chase Employees #1-#10,<br><br>*Defendants*. | Index No. ________________<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT**

AND NOW comes Plaintiffs 218 Broadway, LLC (***"Broadway"***) and Pentalon Construction, Inc. ("***Pentalon***") (collectively, "***Plaintiffs***"), through their undersigned counsel, and respectfully submit this Complaint and in support thereof pleads as follows:

**INTRODUCTION**

1. Plaintiffs bring this Complaint against J.P. Morgan Chase Bank, N.A. ("***Chase***"), Wells Fargo Bank, N.A. ("***Wells Fargo***"), and John Doe Chase Employees #1 - #10 to seek the return of Stolen Funds in the amount of $637,566.33 (the "***Stolen Funds***"). Simply, Chase and John Doe Chase Employees #1 - #10 facilitated the fraudulent opening and usage of an account by a wrongdoer pretending to be Pentalon and/or a lawful beneficiary of Broadway's wire to Pentalon. Chase and John Doe Chase Employees #1 - #10 opened that fraudulent account using completely fraudulent information that Chase and John Doe Chase Employees #1 - #10 knew was false because the real Pentalon has real and unrelated accounts with Chase. Thus, Pentalon was already vetted by and known to Chase and John Doe Chase Employees #1 - #10 as their customer. Soon after the fraudulent account was opened, Broadway wired the Stolen Funds from its Wells Fargo

account to that fraudulent Chase account (with the express intention as stated in the wire instructions of actually benefitting the real Pentalon). The Stolen Funds were drained within a day with the assistance of Chase and John Doe Chase Employees #1 - #10's assistance in a clear fraud-into-money-laundering pattern. Either the Chase Defendants knowingly opened an account for a thief stealing their customer's (Pentalon's) identity (thus aiding the thief) or the Chase Defendants knew that it was depositing a wire intended for Pentalon into an account whose named owner did not match the intended beneficiary of the wire (thus triggering a UCC 4A refund obligation). Given these circumstances, Chase and John Doe Chase Employees #1 - #10 are liable for Plaintiffs' loss under tort or UCC theories. Under a UCC theory, Chase would be required to refund the wire to Wells Fargo, which would then be obligated to refund Broadway.

## THE PARTIES

2. Plaintiff Broadway is a small Utah limited liability company with a principal place of business located at 150 S. State Street, Salt Lake City, Utah, 84111.

3. Broadway is a real estate developer committed to affordable yet high-quality real estate development in Salt Lake City, Utah to improve blighted and underused areas for all stakeholders.

4. Plaintiff Pentalon Construction is a family/friend-owned Utah domestic business corporation with a principal place of business located at 4376 S. 700, Suite 100, Salt Lake City, Utah, 84107.

5. Pentalon is a well-known and longstanding commercial building contractor primarily working in Utah to create multi-family housing in urban areas of need, specializing in affordable and market-rate housing.

6. Defendant Chase is a global financial services firm based in the United States with operations across the United States. Chase is a Delaware corporation with its headquarters at 383 Madison Avenue, New York, New York, 10017.

7. Defendant Wells Fargo is a global financial services firm based in the United States with operations across the United States. Wells Fargo is a Delaware corporation with its headquarters at 101 North Phillips Avenue, Sioux Falls, South Dakota, 57117.

8. John Doe Chase Employees #1-#10 are presently unknown individuals that were involved in aiding theft by opening or maintaining an illegal account and effectuating the transfer of the Stolen Funds and will be identified during the civil-discovery process.

**JURISDICTION AND VENUE**

9. The Commercial Division of this Court has jurisdiction over this Action pursuant to CPLR § 202.70 of the Rules of the Commercial Division, as the amount in controversy, exclusive of punitive damages, interest, costs, disbursements, and counsel fees claimed exceeds $500,000.00, and involves, among other things, claims of breach of the Uniform Commercial Code.

10. This Court has personal jurisdiction over Chase and Wells Fargo under C.P.L.R. § 301 because Chase and Wells Fargo conduct business in New York and have substantial ties to New York. In addition, upon information and belief, the unknown Chase employees are New York citizens and/or are employed by Chase in New York and/or own property in New York.

11. Venue is proper pursuant to CPLR § 503(a) because, upon information and belief, all Defendants reside or conduct business within the jurisdictional boundaries of New York.

## FACTUAL BACKGROUND

### *The Project*

12. Broadway is a real estate developer managing a high-profile construction project to bring forty-eight (48) residential units and one (1) commercial unit to downtown Salt Lake City, Utah (the "***Project***").

13. Since 2021, Broadway has worked diligently on the Project and calculated an anticipated profit of nearly $875,823 while providing substantial benefits to the local community.

14. At all times since its 2021 founding, Broadway has banked exclusively with Wells Fargo, trusting Wells Fargo to provide industry-standard banking services and advice in managing its funds and payments related to the Project.

15. Wells Fargo assigned a specific branch manager to work with Broadway.

16. That Wells Fargo branch manager advised Broadway that Wells Fargo would not release funds to an account on an incoming wire if the name of the intended beneficiary of a wire and the name of the account owner did not match.

17. That Wells Fargo branch manager further advised Broadway that Wells Fargo was confident that Chase had the same policy of not releasing a wire to an account where the beneficiary's name did not match the accountholder name.

18. That Wells Fargo branch manager also stated that Wells Fargo would not allow a same day transfer out of an account receiving an incoming large wire without understanding the purpose of that incoming wire and verifying that the wire was a normal account activity.

19. Broadway's members have even longer-standing relationships with Wells Fargo, going back decades and demonstrating Wells Fargo's knowledge of and risks related to the real estate-development business.

20. Wells Fargo has put relevant Broadway members through its wire-verification process on multiple occasions to verify beneficiary/account name matches and to understand the purpose of incoming wires and later transfers out from accounts receiving incoming wires.

21. Wells Fargo's assurances and practices were part of what gave Broadway the confidence to send or receive wires through large banks like Wells Fargo and Chase because the security and specific series of checks in place across the bank/wire industry are well-established, intensively marketed as safe, and supposed to be uniformly followed.

22. In short, Wells Fargo, Chase, and the banking industry in general marketed wire services as ways to earn business, protect commercial customers, and earn fees that led to Broadway's firm reliance that, if it instructed Wells Fargo to only release wired funds to Pentalon, Wells Fargo and its banking partners would only release those funds to Pentalon.

23. As part of the Project, Broadway engaged Pentalon as its general contractor.

24. Pentalon likewise has worked diligently on the Project and calculated an anticipated profit of approximately $600,000 while providing substantial benefits to its workers and the local community.

25. Pentalon has used Chase for its banking needs (including housing its accounts receivables, subaccounts, and related payments for specific projects) for decades.

26. Yet, Pentalon also uses other banks—and Chase and John Doe Chase Employees #1 - #10 knew that Chase was not Pentalon's bank for purposes of the Project.

27. Because of the conduct of Chase and John Doe Chase Employees #1 - #10 described below, both a direct loss of funds has occurred as well as a substantial delay and impairment of the Project and its related profits, resulting in consequential damages.

***Broadway Attempts To Pay Pentalon's Valid Invoice #2309-01***

28. Shortly before December 13, 2023, Pentalon sent Invoice #2309-01 (the "***Invoice***") seeking a milestone payment of $637,566.33 from Broadway for work performed to date in furtherance of the Project.

29. Alongside the Invoice, on December 13, 2023, Broadway requested wire instructions from Pentalon.

30. On December 13, 2024, Broadway received an e-mail (the "***December 2024 E-Mail***") purportedly from Pentalon's Controller, with a purported copy to Pentalon's President and Pentalon's Project Manager, which included wire account instructions and beneficiary information for Pentalon (the "***Wire Instructions***").

31. However, while the Invoice was legitimate, the Wire Instructions that Broadway received were not—a hacker/fraudster monitoring and manipulating communications in real-time had forged the December 2024 E-Mail, unbeknownst to both Broadway and Pentalon.

***Broadway Goes To Wells Fargo To Pay The Invoice***

32. The next day, on December 14, 2023, Broadway sought to pay the Invoice in accordance with the Wire Instructions that called for sending money to a specific nine-digit account number ending in 0213 and titled to "Pentalon Construction" at Chase (the "***-0213 Account***").

33. Upon information and belief, and in the first alternative, Chase and John Doe Chase Employees #1 - #10 opened the -0213 Account at the request of a fraudster who presented no legitimate authority or records authorizing that fraudster to open an account in the name of Pentalon.

a. In accordance with federal law and banking-industry standards, Chase requires new business customers to provide certain personal-identity and corporate documentation when opening an account.

b. In accordance with federal law and banking-industry standards, Chase requires an existing business customer to provide multi-factor authentication in addition to corporate documentation when opening a new business account or changing the owner or signatory for an existing business customer.

c. These requirements are part of a formal Customer Identification Program that requires Chase and Chase employees to identify and verify the identities of Chase customers to combat money laundering and other illegal activities.

d. Personal and company documents so submitted to Chase to go through a verification process that is also informed by responses to Chase's inquiries about the nature of the business's activities, the purpose of the new account or ownership/signatory change, the anticipated type and value of transactions within the account, and the general background and history of the customer at issue.

e. Chase required all of this information from the real Pentalon and had an extensive file on the real Pentalon.

f. Likewise, Chase requires the signatory on the account to physically appear at a Chase branch to review and verify the required documents, to respond to questions, and to prove the signatory's true identity.

g. Because of Chase's actual practices and trainings, John Doe Chase Employees #1 - #10 either failed to recognize material discrepancies and irregularities in proffered personal identification documents, corporate records, tax identification forms, and related papers submitted by the fraudster or recognized such irregularities and nonetheless proceeded with deliberate indifference to assist the fraudster for personal gain, either tied directly to the fraud or for Chase incentives that create pressure to open accounts and obtain deposits by any means necessary.

h. Chase also has automated processes that, if correctly configured, would immediately detect a large wire transfer sent to a new account that did not fit the profile of anticipated legitimate commercial transactions (and, in fact, matched the profile of a well-known fraud/laundering scheme).

i. It would not be possible for a fake Pentalon/fraudster to open a Chase account in the real Pentalon's name or add the Pentalon name to an unrelated account without Chase and John Doe Chase Employees #1 - #10 violating federal law, disregarding Chase policies, and otherwise falling well below the industry standard of care in managing large-dollar commercial accounts across the banking industry.

34. Upon information and belief, and in the second alternative, Chase and John Doe Chase Employees #1 - #10 allowed a fraudster to access the -0213 Account and use it to receive a transfer known to Chase to be intended for Pentalon when Pentalon was known to Chase to not be a named owner or beneficiary of the -0213 Account.

a. In accordance with federal law and banking-industry standards, Chase requires incoming wires to be vetted against lists of known sanctioned entities or criminals/fraudsters in addition to being scanned for indicia of criminality, suspicious activity, or other red flags that would require the blocking, seizure, rejection, and/or return of funds.

b. Chase likewise is prohibited by law from receiving or facilitating transfers that serve no lawful purpose and thus scans for transfers that are being sent to Chase for non-Chase customers or through Chase for criminal purposes to unknown entities.

c. Chase receives wire transfers from sources around the world and has sophisticated software available to it to scan all information in a wire transmission, such as the source of the wire, the intended beneficiary, the amount, the target account, a memo field, and other details.

d. Chase can only ensure that a wire is properly credited and accepted in a lawful manner by knowing multiple valid details about a wire, such as both the intended account number and the intended recipient of the wire.

e. Chase and John Doe Chase Employees #1 - #10 are familiar with common fraud schemes, including business e-mail compromise scams, which can be easily prevented by a receiving bank by ensuring that an incoming wire's intended recipient indeed matches the account owner (and is otherwise consistent with the account owner's profile, stated account purpose, and prior transaction history).

f. Because of Chase's actual practices and trainings, John Doe Chase Employees #1 - #10 either failed to recognize material discrepancies between incoming wire transfer information submitted by Broadway through Wells Fargo and account holder information submitted by the fraudster or recognized such irregularities and nonetheless proceeded with deliberate indifference to assist the fraudster for personal gain, either tied directly to the fraud or for Chase incentives that create pressure to obtain deposits and process transfers by any means necessary.

g. Chase also has automated processes that, if correctly configured, would immediately detect a large wire transfer intended for one named entity but being received in an account titled to a different entity that appeared to have no relationship to the intended beneficiary and did not fit the profile of anticipated legitimate commercial transactions (and, in fact, matched the profile of a well-known fraud/laundering scheme).

h. It would not be possible for a fake Pentalon/fraudster to use a Chase account in some other entity's name to receive a wire intended for Pentalon without Chase and John Doe Chase Employees #1 - #10 violating federal law, disregarding Chase policies, and otherwise falling well below the industry standard of care in managing large-dollar commercial accounts across the banking industry.

35. On December 14, 2023, Broadway executed a wire in person at Wells Fargo (the "***Wire***") with the account representative (the "***Wells Fargo Account Representative***") who handles all such Broadway wires using the Wire Instructions.

36. Wells Fargo required Broadway to provide the name, address, and account number for the intended beneficiary of the Wire.

37. Wells Fargo (independently via its general advertising and specifically through the Wells Fargo Account Representative) represented that its transfer mechanisms that interfaced with Chase would match all of those details (name, address, and account number) with Chase to ensure proper crediting of the Wire to Pentalon.

38. The Wire Instructions, which included the -0213 Account information as well as clearly identifying the beneficiary of the Wire as "Pentalon Construction" with a Utah address, were provided to the Wells Fargo Account Representative—and the Wire was executed for the full amount of the Invoice.

39. Broadway sent a confirmation e-mail to Pentalon, confirming that Wells Fargo sent the Wire to Chase and that Pentalon would receive the Wire at Chase later that day (the "***Wire Confirmation***").

***Broadway and Pentalon Determine That The Wire Instructions Were Fraudulent***

40. Between December 18, 2023 and December 28, 2023, Broadway and Pentalon engaged in legitimate in-person, telephonic, and electronic correspondence (text messaging and e-mail) regarding the Wire, the Wire Confirmation confirming that the Wire had gone through the -0213 Account at Chase (as verified by Broadway and Wells Fargo), and confusion over Pentalon's inability to find the Wire in its accounts.

41. On December 18, 2023, at an in-person meeting to address the missing Wire, Broadway noted again that the Invoice had been paid via the Wire according to the precise Wire Instructions received from Pentalon.

42. After Christmas, on December 27, 2023, Pentalon's Project Manager made an oral inquiry about the status of the Invoice payment, and Broadway noted again that the Wire had gone out previously from Broadway's Wells Fargo account (the "***Wells Fargo Account***") to the -0213 Account.

43. Broadway confirmed that the Wells Fargo Account had been debited reflecting payment of the Invoice and that the Wire had cleared the Wells Fargo Account.

44. On December 28, 2023, Pentalon's Project Manager advised that Pentalon was still having difficulty locating the Wire in its accounts, and Broadway provided a copy of the Wire Confirmation to both Pentalon's Controller (who manages wires for Pentalon) and Pentalon's Project Manager.

45. Ultimately, Broadway requested another copy of the Wire Instructions previously provided to Broadway, and when Pentalon could not provide the Wire Instructions, it was discovered that the e-mail sending the Wire Instructions to Broadway was created by a hacker/fraudster and not Pentalon.

46. This hacker/fraudster had gained access to private e-mail communication, had assumed Pentalon's identity, had submitted the false Wire Instructions in real time to Broadway, and had taken steps to hinder detection by both Broadway and Pentalon.

***Broadway Meets With Wells Fargo Representatives***

47. Immediately after discovery of the fraud and within days of the wire being sent, Broadway met in person with Wells Fargo representatives to review the matter, to open a fraud investigation, and to place a wire recall request to Chase.

48. At that time, Wells Fargo verified that, although the beneficiary account number identified in the Wire Instructions was incorrect, the beneficiary's name (Pentalon) and address (the Utah address) were both accurate.

49. Wells Fargo confirmed that it had sent the wire amount, the beneficiary account number, the beneficiary's name, and the beneficiary address to Chase when processing the Wire.

50. Wells Fargo further confirmed that it was its policy to not send wires to an account that was not titled to the named beneficiary of the wire—meaning that Chase and John Doe Chase Employees #1 - #10 either (1) knew of and concealed/ignored a mismatch between the intended beneficiary of the Wire and the owner of the -0213 Account or (2) had allowed a fraudster to open and use the -0213 Account in Pentalon's name and using Pentalon's address when it was not in any way connected to Pentalon.

51. Pentalon never actually authorized the opening or usage of the -0213 Account (and indeed has entirely separate accounts at Chase); therefore, despite making efforts to do so, Pentalon could not return the Wire, obtain any bank statements or information on the -0213 Account, or instruct Chase regarding the -0213 Account opened without its permission.

52. The discovery of this rogue account was quite remarkable, considering Pentalon's uniqueness, profile, and other relationships with Chase.

53. Indeed, Chase has federal and state legal obligations—as well as internal policies and industry standards—that prohibit Chase or its employees from opening or maintaining accounts using stolen identities, controlled by hackers/fraudsters, and/or facilitating fraud or money laundering.

54. Nonetheless, Pentalon immediately notified Chase and John Doe Chase Employees #1 - #10 of the fraud and sought assistance from Chase in obtaining control of the -0213 Account, which Chase disregarded.

***Chase Refuses To Return The Wire or Unwind Money-Laundering Transactions***

55. Local law enforcement did not have the tools to address this crime, so the FBI was promptly notified.

56. The FBI confirmed that the -0213 Account was fraudulent, opened shortly before the Wire was sent, and was essentially drained through further suspicious transactions within twenty-four (24) hours after being opened in a clear pattern of common suspicious activity indicating Business E-Mail Compromise ("***BEC***") fraud and later laundering of such stolen proceeds.

57. Wells Fargo informed Broadway that it had provided substantial evidence of the fraud directly to Chase and John Doe Chase Employees #1 - #10 (in addition to law enforcement) from December 2023 through February 2024, but Chase and John Doe Chase Employees #1 - #10 nevertheless refused to honor the wire recall.

58. Indeed, Chase and John Doe Chase Employees #1 - #10 replied to Wells Fargo after the first recall request and noted that Chase and John Doe Chase Employees #1 - #10 were waiting for "its client" (the purported owner of the -0213 Account) to decide if it would authorize the return of the Stolen Funds (which presumably had been moved from the -0213 Account to other Chase accounts controlled by the fraudster).

59. Chase and John Doe Chase Employees #1 - #10 completely disregarded that the real Pentalon was simultaneously telling Chase and John Doe Chase Employees #1 - #10 that the

-0213 Account was opened fraudulently and that the Stolen Funds in it (or derived from it) should be frozen and immediately returned to Broadway.

60. Chase and John Doe Chase Employees #1 - #10 apparently were also in communication with the actual fraudster and chose to listen to the fraudster's false claim of entitlement to the Stolen Funds over the pleas (and significant evidence) of Wells Fargo, the FBI, Broadway, and Pentalon.

61. At Broadway's urging and in accordance with its own fraud-prevention and customer-protection policies, Wells Fargo continued to send recall requests (over a period of days, weeks, and months) to Chase, reiterating the fraud claim and related evidence, only for Chase to ignore the requests or send the same placeholder response that "Chase is asking its client if it wants to give the money back."

62. Neither the -0213 Account nor any Chase account receiving funds from the -0213 Account was reported as frozen by Chase and John Doe Chase Employees #1 - #10 at any point in time or used to return the Stolen Funds to Plaintiffs.

**COUNT I: AIDING AND ABETTING CONVERSION**
***Against Chase and John Doe Chase Employees #1 - #10***

63. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

64. At all times material to this Complaint, before the Wire, Broadway owned and was in possession of all funds the fraudster eventually appropriated through its unlawful retention of the Stolen Funds.

65. Through the fraudster holding onto and unlawfully retaining possession of the Stolen Funds, without any authorization or entitlement to the Stolen Funds, Broadway was deprived of the use and possession of the Stolen Funds due to Chase and John Doe Chase

Employees #1 - #10 processing the Wire and releasing the Stolen Funds in violation, upon information and belief, of both federal law and Chase policy.

66. In the first alternative, Chase and John Doe Chase Employees #1 - #10, upon information and belief, had actual knowledge of the fraudster's conversion because Chase and John Doe Chase Employees #1 - #10 knew either (1) that the beneficiary identified on the Wire Instructions did not match the beneficiary of the -0213 Account or (2) that the -0213 Account was fraudulently opened because Pentalon was already a Chase customer and known to Chase.

67. In the second alternative, Chase and John Doe Chase Employees #1 - #10, upon information and belief, substantially assisted the fraudster in his/her actions by processing the Wire without confirming either (1) that the beneficiary identified on the Wire Instructions matched the -0213 Account or (2) that the -0213 Account was opened with proper authorization.

68. In doing so, Chase and John Doe Chase Employees #1 - #10 actively and willfully disregarded warning signs such as, upon information and belief, (1) the discrepancy between the identified beneficiary in the Wire Instructions and the beneficiary of the -0213 Account and (2) that Pentalon already had a banking relationship with Chase and was known to Chase before the opening of the -0213 Account.

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor together with monetary damages for actual loss incurred by Plaintiffs, consequential damages, pre- and post-judgment interest, costs, legal fees, and expenses against Chase and John Doe Chase Employees #1 - #10 jointly and severally.

## COUNT II: AIDING AND ABETTING FRAUD
***Against Chase and John Doe Chase Employees #1 - #10***

69. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

70. The fraudster fraudulently received the Stolen Funds.

71. Chase and John Doe Chase Employees #1 - #10, upon information and belief, had actual knowledge that the fraudster's conduct was fraudulent when either (1) Chase and John Doe Chase Employees #1 - #10 released the Wire to the fraudster, despite the discrepancy between the identified beneficiary in the Wire Instructions and the beneficiary of the -0213 Account, or (2) opening the -0213 Account without proper authorization from Pentalon despite Pentalon being a known customer to Chase.

72. Chase and John Doe Chase Employees #1 - #10, upon information and belief, willfully disregarded red flags that any bank and/or bank employee would know indicate an intent to commit fraud, including (1) the discrepancy between the identified beneficiary in the Wire Instructions and the beneficiary of the -0213 Account, (2) opening the -0213 Account without proper authorization from Pentalon despite Pentalon being a known customer to Chase, and (3) immediately initiating additional transfers with no lawful purpose out of the -0213 Account to launder the funds obtained.

73. Moreover, Chase and John Doe Chase Employees #1 - #10, upon information and belief, failed to abide by applicable law and Chase policies requiring them to ensure that (1) the beneficiary of a large wire matches the named beneficiary on the account and (2) accounts at Chase are opened with proper authorization.

74. By either processing the Wire without requiring that the beneficiary identified in the Wire Instructions match the beneficiary of the -0213 Account or opening the -0213 Account without authorization, Chase and John Doe Chase Employees #1 - #10, upon information and belief, provided substantial assistance to the fraudster.

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor together with monetary damages for actual loss incurred by Plaintiffs, consequential damages, pre- and post-judgment interest, costs, legal fees, and expenses against Chase and John Doe Chase Employees #1 - #10 jointly and severally.

**COUNT III: VIOLATION OF UCC § 4A-207(c)(2) (DECLARATORY JUDGMENT)**
***Against Chase***

75. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

76. Broadway is the rightful, beneficial owner of the Stolen Funds.

77. Chase, upon information and belief, opened the -0213 Account without proper authorization and/or credited the Stolen Funds to the -0213 Account despite knowing of a mismatched beneficiary for the Wire when compared to the purported name of the owner of the -0213 Account.

78. The UCC and applicable case law allow for a court to enter a declaratory judgment against a beneficiary bank (Chase here) of a wire transfer in these circumstances requiring the return of the value of the Stolen Funds to the sending bank (Wells Fargo).

79. Therefore, this Court should enter a judgment directing Chase to immediately return the value of the Stolen Funds to Wells Fargo (so that Wells Fargo may credit Broadway's account as noted below).

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor directing Chase to immediately return the value of the Stolen Funds to Wells Fargo.

**COUNT IV: VIOLATION OF UCC § 4A-207(c)(2) (REFUND)**
***Against Wells Fargo***

80. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

81. Wells Fargo requires that wire instructions sent to it identify the beneficiary by name and address.

82. In requiring Broadway to identify the beneficiary by name and address (and not just an account number) before sending a wire, Wells Fargo represented that, if the name or address on the -0213 Account did not match the sending instructions, the payment of $637,566.33 would not be deposited to the -0213 Account and would instead be returned to Broadway.

83. Wells Fargo knew or should have known that, by requiring the name and address for the beneficiary account holder before agreeing to sending a wire, that Broadway would believe that Wells Fargo would ensure that the name and address on the -0213 Account and the intended beneficiary name and address on the sending instructions matched.

84. Broadway justifiably relied on Wells Fargo in sending the Wire, believing that, if the name or address did not match the -0213 Account, the wire (now known as the Stolen Funds) would be promptly returned to Broadway.

85. Broadway had no obligation to the fraudster, and the fraudster had no rights to the Stolen Funds.

86. Broadway was not notified by Wells Fargo that Wells Fargo might submit the Wire to the -0213 Account (consistent with the Wire Instructions) even if the -0213 Account owner name did not match the beneficiary identified on the Wire Instructions or even if the -0213 Account was not opened by the real Pentalon; indeed, Wells Fargo provided the opposite assurances that all such identifying information would be collected, transmitted, and verified by Chase.

87. But for the implicit and explicit promises that Wells Fargo (and/or Chase) would verify that the real beneficiary of the -0213 Account matched the beneficiary identified in the Wire Instructions, Broadway would not have sent the Wire.

88. Plaintiffs were damaged by the loss of the Wire in an amount no less than $637,566.33.

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor together with monetary damages for actual loss incurred by Plaintiffs, consequential damages, pre- and post-judgment interest, costs, legal fees, and expenses against Wells Fargo.

Dated: August 7, 2025

/s/ *Christie R. McGuinness*

Christie R. McGuinness, Esq.
christie.mcguinness@saul.com
SAUL EWING LLP
1270 Avenue of the Americas, Suite 2800
New York, NY 10020
Telephone: (212) 980-7200
Facsimile: (212) 980-7209

*Counsel for Plaintiffs*
*218 Broadway, LLC and Pentalon Construction, Inc.*

## ATTORNEY VERIFICATION

CHRISTIE MCGUINESS, an attorney duly admitted to practice law before the Courts of the State of New York hereby affirms the following statements to be true under the penalties of perjury:

I am associated with the law firm Saul Ewing LLP, attorneys for Plaintiffs 218 Broadway, LLC and Pentalon Construction, Inc. in the within action and am fully familiar with the facts and circumstances set forth herein.

Affirmant has read the foregoing Verified Complaint, knows the contents thereof, and the same is true to Affirmant's own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters Affirmant believes them to be true.

Affirmant further states that the reason this Affirmation is made by the undersigned and not by the Plaintiffs is because Plaintiffs neither maintain their place of business nor are present in New York County where the Affirmant maintains her office.

The basis of Affirmant's belief as to all matters not stated to be upon Affirmant's knowledge is investigation and other information maintained in the file of said law firm and that learned in conversation with the client.

Dated: New York, New York
August 7, 2025

/s/ *Christie R. McGuinness*
CHRISTIE R. MCGUINNESS